which secured by the mortgage loan would be wrongfully foreclosed.

22.  That Ocwen practices include paying financial incentives to its staff of loan collectors for moving properties with equity into foreclosure. Plaintiff currently has approximately $32,000.00, in equity by the last appraised value, and $321,500.00, in equity pursuant to a contractor offer interested in building a sub-division in the area.

23.  That Ocwen failed and/or refused to give credit for payments as and when they were made by Plaintiff.

24.  That Plaintiff on May 01, 2007, verified through the Oakland County Register of Deeds records that Sebring was the only lender recorded. Further that no assignment from Sebring to Ocwen, HSBC and/or Ace has ever been recorded. **Exhibit E.**

25.  That Plaintiff on May 01, 2007, by certified mailed to Ocwen made a formal demand for information to wit: who held her mortgage note, why payments made were being held in suspense, why they where reporting false information as to late payments to the credit agencies **Exhibit E.** Ocwen signed for Plaintiff's certified mail on May 21, 2007, and as a response to Plaintiff's written request for information on June 1, 2007, they forwarded

LERMAN & VALENTINO, P.C.
Attorneys at Law
43494 Woodward Avenue, Suite 205 • Bloomfield Hills, Michigan 48302
Telephone (248) 334-7787 • Fax (248) 334-7202

LEHMAN & VALENTINO, P.C.
Attorneys at Law
43494 Woodward Avenue, Suite 203 * Bloomfield Hills, Michigan 48302.
Telephone (248) 334-7787 * Fax (248) 334-7202

Plaintiff's mortgage account to the law office of Potestivo & Associates, P.C., to begin foreclosure proceedings.

26.   That based upon the Lender Sebring going out of business, Ocwen's refusal to disclose who actually held Plaintiff's mortgage note, and the fact that no assignment has ever been recorded Plaintiff withheld $899.04, of the May 2007, and $1,486.01, of the June 2007, mortgage payments from Ocwen.

27.   That counsel for Plaintiff contacted Mr. Potestivo's offices on June 13, 2007, and advised "Susan" that the only payment's due and owing were May 2007, and June 2007, which were withheld due to Ocwen's refusal to provide proof that the note had been assigned and that Ocwen was assigned by the new holder to collect the mortgage payments. Payment currently owed are not due to Plaintiff's lack of money, but Plaintiff's desire to know that she was not being defrauded. At no time did attorney Potestivo disclose that foreclosure by advertisement had been commence or acknowledge that for three (3) weeks of advertisement had occurred and no notice was served upon Plaintiff until after counsel made contact with Mr. Potestivo's office. **Exhibit G**

28.   That Ocwen is the only entity Plaintiff has had any

LEHMAN & VALENTINO, P.C.
Attorneys at Law
43494 Woodward Avenue, Suite 203 • Bloomfield Hills, Michigan 48302.
Telephone (248) 334-7787 • Fax (248) 334-7202

contact with and was working for Sebring. Once Sebring went out of business Ocwen refused to disclose any new note holder. Foreclosure attempts began February 21, 2007, the second (2nd) month Ocwen began servicing Plaintiff's mortgage payments and immediately after Sebring went out of business. **Exhibit H**

29.  That Ocwen after acceptance of payment on Plaintiff's note on April 3, 2007, and on April 4, 2007, issued a certified "notice of default". **Exhibit I**

30.  That Ocwen is not even listed in the foreclosure notices.

31.  That Ocwen's last notice of default certified mailed to Plaintiff was dated April 17, 2007, Exhibit J. On May 1, 2007, Plaintiff certified mailed to Ocwen her written dispute of the debt, well within the required thirty (30) day dispute period. Less than ten (10) days after their receipt of Plaintiff's written dispute of the debt, transferred Plaintiff's mortgage loan to their foreclosure attorney on June 1, 2007.

32.  That Plaintiff is a victim of the Defendant's wrongful conduct.

33.  That the date set forth for the foreclosure sale is July 03, 2007.

WHEREFORE, Plaintiff prays for judgment against the Defendants, Ocwen, HSBC, and Ace, declaratory judgment that the Defendant's that

have no interest in Plaintiff's property are permanently enjoined
from any proceeding to foreclose on Plaintiff's property, an order
quieting title and extinguishing Sebring's mortgage recorded against
the property, an award of money damages for damage to Plaintiff's
good name and credit standing, from any in an amount in excess of
twenty five thousand dollars ($25,000.00) as is deemed just and
equitable under the facts and circumstances, including exemplary
damages, actual attorney fees, and court costs interest at the
statutory rate from the date of filing the Complaint and any such
further relief deemed just and equitable under the facts and
circumstances.

## COUNT I
## WRONGFUL FORECLOSURE AND DECLARATORY ACTION

34.  That Plaintiff incorporates paragraphs one (1) through
     thirty-three (33) of its Complaint as fully set forth
     herein paragraph by paragraph and word for word.

35.  Ocwen, HSBC, and Ace, have committed wrongful foreclosure
     by virtue of the following actions:

         (a)  the Defendant have no interest, claim or
              lien against Plaintiff's property;
         (b)  accepting payments and pretending that aa
              lack of payment was in default;
         (c)  failing to provide Plaintiff timely and
              clear   information about the timing and
              amount of
              payments owed;
         (d)  misapplying payments received;
         (e)  failing to comply with contractual and/or
              statutory notice provisions regarding

LEHMAN & VALENTINO, P.C.
Attorneys at Law
43494 Woodward Avenue, Suite 203 * Bloomfield Hills, Michigan 48302
Telephone (248) 334-7787 * Fax (248) 334-7202

LEHMAN & VALENTINO, P.C.

Attorneys at Law

43494 Woodward Avenue, Suite 215 • Bloomfield Hills, Michigan 48302.

Telephone (248) 334-7787 • Fax (248) 334-7202

foreclosure;

(f)     continuing with efforts to foreclose and evict Plaintiff despite the fact that Plaintiff has demanded proof that Defendant's have any claim or interest against Plaintiff's property which Defendant' have refused to provide; and

(g)     demanding more than is actually due to avoid foreclosure.

36.     There is no legal or rightful basis for the Defendant's HSBC and Ace's actions in connection with the wrongful foreclosure of Plaintiff's property. If this foreclosure and eviction were permitted to continue and occur, it would be in direct violation of Plaintiff's rights. Plaintiff seeks a declaratory judgment that the foreclosure was wrongful, of no effect and void and that the property properly and legally lies with Plaintiff.

37.     That the Defendant's conduct has caused losses to Plaintiff for which she seeks to recover damages, including reimbursement of overcharges and overpayments.

WHEREFORE, Plaintiff prays for judgment against the Defendants, Ocwen, HSBC, and Ace, declaratory judgment that the Defendant's that have no interest in Plaintiff's property are permanently enjoined from any proceeding to foreclose on Plaintiff's property, an order quieting title and extinguishing Sebring's mortgage recorded against the property, an award of money damages for damage to Plaintiff's good name and credit standing, from any in an amount in excess of twenty five thousand dollars ($25,000.00) as is deemed just and

equitable under the facts and circumstances, including exemplary damages, actual attorney fees, and court costs interest at the statutory rate from the date of filing the Complaint and any such further relief deemed just and equitable under the facts and circumstances.

## COUNT III
## BREACH OF CONTRACT

38.   That Plaintiff incorporates paragraphs one (1) through thirty-seven (37) of its Complaint as fully set forth herein paragraph by paragraph and word for word.

39.   Ocwen, HSBC, and Ace, have committed wrongful foreclosure by virtue of the following actions:

  (a)   Defendant's failure to demonstrate any claim of interest to lien recorded against Plaintiff's property owned by the Defendant's;
  (b)   accept payments and pretending that a lack of payment was in default;
  (b)   failing to provide Plaintiff timely and clear information about the timing and amount of payments owed;
  (c)   misapplying payments received;
  (d)   failing to comply with contractual and/or statutory notice provisions regarding foreclosure;
  (e)   continuing with efforts to foreclose and evict Plaintiff despite the fact that Plaintiff has attempted to refinance the debt but has been prevented from refinancing and paying off the claimed debt; and
  (f)   demanding more than is actually due to avoid foreclosure.

40.   That counsel for the Defendant's failed and/or

LEHMAN & VALENTINO, P.C.
Attorneys at Law
43494 Woodward Avenue, Suite 203 * Bloomfield Hills, Michigan 48302
Telephone (248) 334-7787 * Fax (248) 334-7202

refused to respond to Plaintiff and her counsel's attempt to resolve the dispute and reinstate the mortgage loan.

41. That on April 3, 2007, Ocwen solicited a $105.00, note payment from Plaintiff, which she paid, and on April 4, 2007, certified mailed to Plaintiff a notice of default **Exhibit I.**

42. That Ocwen certified mailed to Plaintiff on April 17, 2007, a "notice of default" which provides in relevant part: **Exhibit J**

> "Unless you dispute the validity of the debt, or any portion thereof, within thirty (30) days after receipt of this letter, the debt will be assumed to be valid by Ocwen. If you notify Ocwen in writing within thirty (30) days that the debt or a portion of the debt is disputed. Ocwen will send you verification of the debt. If you would like to obtain such verification, direct your response in writing to the Loan Resolution Consultant within thirty (30) days. The failure to dispute the validity of the debt may not be construed by any court as an admission of liability by you."

43. That all of the notice of default's certified mailed to Plaintiff fail to specify that the loan was "being accelerated" only that it was in default, failed to identify who owned the note or the basis upon which Defendant's claim a right to foreclose.

44. That Ocwen, HSBC, and Ace, falsely advertised that the redemption period after sheriff's sale would be a 6 month

LEHMAN & VALENTINO, P.C.
Attorneys at Law
43494 Woodward Avenue, Suite 203 • Bloomfield Hills, Michigan 48302.
Telephone (248) 334-7787 • Fax (248) 334-7202

period in violation of MCL 600.3240 (12) which provides
that property over three (3) acres are provided a one (1)
year redemption period.    Plaintiff's property is 4.77
acres and as such should have clearly been listed within
the notice of foreclosure to provide for a one (1) year
redemption period.

45.   That the Defendant's charged Plaintiff fees for services
that were never provided, charged "hidden fees", which
Ocwen had a fiduciary duty to disclose, charged illegal
fees, and committed violations of the Michigan Consumer
Protection Act (MCPA).

46.   That the Defendant's violated 12 USC 2605 which provides
that "federally related mortgage" be given notice of an
assignment of the mortgage at least 15 days before and not
more than 15 days after the assignment." Ocwen never
provided notice to Plaintiff of HSBC and Ace's assignment
of her mortgage note, and as of May 15, 2007, the Oakland
County Register of Deeds records indicate that Sebring is
the holder of Plaintiff's mortgage note, and no assignment
to Ocwen, HSBC and/or Ace was ever filed and recorded with
the Register of Deeds for Oakland County indicating that
Ocwen, HSBC and/or Ace have absolutely no title interest
in Plaintiff's property pursuant to MCL 600.3201.

47.   That Plaintiff was not informed and/or notified of any

LEHMAN & VALENTINO, P.C.
Attorney at Law
43494 Woodward Avenue, Suite 203 * Bloomfield Hills, Michigan 48302
Telephone (248) 334-7787 * Fax (248) 334-7202

Page 14 of 29

assignment of her note and none was recorded. Further Sebring's alleged assignment with Ocwen was as a servicer only. Ocwen, HSBC, and Ace have no interest in Plaintiff property.

WHEREFORE, Plaintiff prays for judgment against the Defendants, Ocwen, HSBC, and Ace, declaratory judgment that the Defendant's that have no interest in Plaintiff's property are permanently enjoined from any proceeding to foreclose on Plaintiff's property, an order quieting title and extinguishing Sebring's mortgage recorded against the property, an award of money damages for damage to Plaintiff's good name and credit standing, from any in an amount in excess of twenty five thousand dollars ($25,000.00) as is deemed just and equitable under the facts and circumstances, including exemplary damages, actual attorney fees, and court costs interest at the statutory rate from the date of filing the Complaint and any such further relief deemed just and equitable under the facts and circumstances.

### COUNT IV
### TERMINATE FORECLOSURE BY ADVERTISING AND FOR TEMPORARY AND PERMANENT RESTRAINING ORDER

48. That Plaintiff incorporates paragraphs one (1) through forty-seven (47) of its Complaint as fully set forth herein paragraph by paragraph and word for word.

49. That Plaintiff seeks to preserve the status quo during the pendency of this lawsuit, which would leave Plaintiff in

Page 15 of 29

LEHMAN & VALENTINO, P.C.
Attorneys at Law
43494 Woodward Avenue, Suite 203 • Bloomfield Hills, Michigan 48302.
Telephone (248) 334-7757 • Fax (248) 334-7202

possession of her home and would prevent Defendants from continuing with their wrongful foreclosure and sale. Plaintiff further seeks a Temporary Restraining Order, Temporary Injunction, and Permanent Injunction to enjoin and restrain all of the Defendants, their agents, servants, employees, representatives, or attorneys from the following:

(a) issue an order preventing the foreclosure sale scheduled for July 3, 2007;

(b) issuing a notice of acceleration, notice of intent to foreclose, notice of foreclosure; notice posting of foreclosure, or otherwise taking actions designed to accomplish a foreclosure;

(c) attempting to or actually taking possession of the property, which is located at 3630 Waldon Road, Lake Orion, Michigan 48360;

(d) interfering in any way with Plaintiff's possession of the Property;

(e) from taking any action whatsoever that may be construed as unreasonable debt collection or otherwise violating the Michigan or Federal statutes regarding debt collection.

50. That Plaintiff seeks a Temporary Restraining Order with respect to the sale scheduled for July 3, 2007, together with damages for the wrongful foreclosure by Defendants including costs and actual attorney fees.

51. That by virtue of the foregoing facts Plaintiff will suffer irreparable harm, injury and damage in the event this Court does not enter a temporary restraining order preventing the sale from going forward on July 3, 2007, at

LERMAN & VALENTINO, P.C.
Attorneys At Law
43494 Woodward Avenue, Suite 203 • Bloomfield Hills, Michigan 48302.
Telephone (248) 334-7717 • Fax (248) 334-7202

10:00 a.m. and there is not adequate legal remedy.

52.     That Plaintiff seeks a permanent order restraining any of the Defendants, their agents, employees, and attorneys from attempting to collect a debt, harass foreclose, or take any other action against Plaintiff connected with the subject matter of this suit.

WHEREFORE, Plaintiff prays for judgment against the Defendants, Ocwen, HSBC, and Ace, declaratory judgment that the Defendant's that have no interest in Plaintiff's property are permanently enjoined from any proceeding to foreclose on Plaintiff's property, an order quieting title and extinguishing Sebring's mortgage recorded against the property, an award of money damages for damage to Plaintiff's good name and credit standing, from any in an amount in excess of twenty five thousand dollars ($25,000.00) as is deemed just and equitable under the facts and circumstances, including exemplary damages, actual attorney fees, and court costs interest at the statutory rate from the date of filing the Complaint and any such further relief deemed just and equitable under the facts and circumstances.

## COUNT V
## QUIET TITLE

53.     That Plaintiff incorporates paragraphs one (1) through fifty-two (52) as fully set forth herein paragraph by paragraph and word for word.

54.     That Plaintiff was, at all times relevant hereto, and is

LEHMAN & VALENTINO, P.C.
Attorneys At Law
43494 Woodward Avenue, Suite 203 • Bloomfield Hills, Michigan 48302
Telephone (248) 334-7787 • Fax (248) 334-7202

now, the owner in fee and is in possess of the subject property.

55. That Ocwen, HSBC, and Ace unlawfully claimed an interest by asserting an unknown interest in the Sebring mortgage and mortgage note, which is a cloud upon the Plaintiff's title to the premises which diminishes its value pursuant to MCL 600.3201.

56. That Plaintiff has offered Ocwen, HSBC, and Ace, the opportunity to remove their claim or provide proof of same which they have failed to do and their claim is a cloud upon Plaintiff's title.

57. That the Defendants, Ocwen, HSBC, and Ace, by encumbering Plaintiff's property in violation of MCL 600.2901a is liable to Plaintiff for all costs including actual attorney fees and all damages including exemplary damages.

WHEREFORE, Plaintiff prays this Honorable Court enter its Order:

1. Declaring Defendants foreclosure action and claim against the Property illegal and void and to be stricken from the record title the mortgage which is a cloud upon Plaintiff title.

2. Defendants, Ocwen, HSBC, and Ace, release to Plaintiff all right, title and interest which Defendant claims, or appears to have, in the premises by reason of said mortgage.

3. Any person or entity claiming under or through Defendants, Ocwen, HSBC, and Ace, be ordered to have no right, title or interest whatsoever in or to the land or any part of it, and that Plaintiff be given leave to cause that order to be recorded in the office of the Register of Deeds.

4. Award {Plaintiff damages including exemplary damages and

all costs including actual attorney fees.

5. Plaintiff have such other and further relief agreeable to equity and good conscience.

## COUNT VI
## NEGLIGENCE AND GROSS NEGLIGENCE

58. That Plaintiff incorporates paragraphs one (1) through fifty-seven (57) of its Complaint as fully set forth herein paragraph by paragraph and word for word.

59. That the Defendant's owed a duty of care to Plaintiff to adequately train and supervise its staff of loan collectors and servicing agents in the proper and legal servicing of mortgages, such as the mortgage owed by Plaintiff. Ocwen breached its duty to Plaintiff by (1) failing to adequately train and/or supervise its staff of loan collectors and servicing agents in the servicing of Plaintiff's mortgage by allowing the wrongful foreclosure of Plaintiff's home, and (2) to show proof that it has an interest and failing to identify what that interest is through the Sebring mortgage and mortgage note after Sebring went out of business (3) providing financial incentives to those collectors and agents for moving properties, including Plaintiff's into foreclosure.

60. That the Defendant's negligence has proximately caused Plaintiff to lose her feeling of security in owning her home and actual damages for which she seeks recovery.

LEHMAN & VALENTINO, P.C.
Attorneys at Law
43494 Woodward Avenue, Suite 205 • Bloomfield Hills, Michigan 48302.
Telephone (248) 334-7787 • Fax (248) 334-7202

61.     That the Defendant's conduct and neglect was in such
        complete disregard for Plaintiff's rights in her property
        as to amount to gross negligence for which Plaintiff seeks
        to recover punitive damages.

WHEREFORE, Plaintiff prays for judgment against the Defendants, Ocwen, HSBC, and Ace, declaratory judgment that the Defendant's that have no interest in Plaintiff's property are permanently enjoined from any proceeding to foreclose on Plaintiff's property, an order quieting title and extinguishing Sebring's mortgage recorded against the property, an award of money damages for damage to Plaintiff's good name and credit standing, from any in an amount in excess of twenty five thousand dollars ($25,000.00) as is deemed just and equitable under the facts and circumstances, including exemplary damages, actual attorney fees, and court costs interest at the statutory rate from the date of filing the Complaint and any such further relief deemed just and equitable under the facts and circumstances.

**COUNT VII**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

62.     That Plaintiff incorporates paragraphs one (1) through
        sixty-one (61) of its Complaint as fully set forth herein
        paragraph by paragraph and word for word.

63.     That the Defendant's intentional and/or reckless actions
        reflect its sinister desire to confuse and, if necessary,
        intimidate Plaintiff in an effort to cause the wrongful

Page 20 of 29

LEHMAN & VALENTINO, P.C.
Attorneys At Law
43494 Woodward Avenue, Suite 210 * Bloomfield Hills, Michigan 48302
Telephone (248) 334-7787 * Fax (248) 334-7202

foreclosure and for Plaintiff ultimately to lose her home. The Defendant's actions have been and continue to be extreme and outrageous, with a complete disregard for Plaintiff's rights, and have been carried out with the knowledge and sinister desire to sell Plaintiff's home covertly through a wrongful and illegal foreclosure and then through an eviction process take her home. Ocwen's actions have caused severe emotional distress to Plaintiff, including embarrassment, fear, humiliation, and unnecessary and excessive worry.

WHEREFORE, Plaintiff prays for judgment against the Defendants, Ocwen, HSBC, and Ace, declaratory judgment that the Defendant's that have no interest in Plaintiff's property are permanently enjoined from any proceeding to foreclose on Plaintiff's property, an order quieting title and extinguishing Sebring's mortgage recorded against the property, an award of money damages for damage to Plaintiff's good name and credit standing, from any in an amount in excess of twenty five thousand dollars ($25,000.00) as is deemed just and equitable under the facts and circumstances, including exemplary damages, actual attorney fees, and court costs interest at the statutory rate from the date of filing the Complaint and any such further relief deemed just and equitable under the facts and circumstances.

## COUNT VIII
## UNREASONABLE DEBT COLLECTION PRACTICES UNDER MICHIGAN LAW

64. That Plaintiff incorporates paragraphs one (1) through sixty-four (64) of its Complaint as fully set forth herein paragraph by paragraph and word for word.

65. That the Defendant's actions in failing to properly account for Plaintiff's payments, failing to verify the debt on the request of Plaintiff, posting for foreclosure when Plaintiff was disputing the debt, preventing Plaintiff from curing the claimed default, giving inconsistent accounting information on the amount of the debt, adding outrageous charges to Plaintiff's loan balance, constitute unreasonable debt collection practices. As a result of these practices, Plaintiff has suffered losses and is at risk of losing her home through an eviction proceeding. Further, Plaintiff has suffered the emotional stress that naturally flows from a situation where a mortgage servicing company steps out of its role of servicing and tries to take a home wrongfully.

WHEREFORE, Plaintiff prays for judgment against the Defendants, Ocwen, HSBC, and Ace, declaratory judgment that the Defendant's that have no interest in Plaintiff's property are permanently enjoined from any proceeding to foreclose on Plaintiff's property, an order quieting title and extinguishing Sebring's mortgage recorded against

the property, an award of money damages for damage to Plaintiff's good name and credit standing, from any in an amount in excess of twenty five thousand dollars ($25,000.00) as is deemed just and equitable under the facts and circumstances, including exemplary damages, actual attorney fees, and court costs interest at the statutory rate from the date of filing the Complaint and any such further relief deemed just and equitable under the facts and circumstances.

## COUNT IX
## VIOLATION OF THE MICHIGAN DEBT COLLECTION PRACTICES ACT

66.   That Plaintiff incorporates paragraphs one (1) through sixty-six (66) of its Complaint as fully set forth herein paragraph by paragraph and word for word.

67.   That the Defendant's are a debt collector for purposes of the Michigan Debt Collection Practices Act ("MDCPA"). Ocwen used unfair or unconscionable means by collecting or attempting to collect interest or a charged fee or expense incidental to the allegation that was not authorized by the terms of the parties' contract, in violation of MDCPA 15 U.S.C.A. § 1692. The Defendant's threatened to take action prohibited by law, including threatening a wrongful foreclosure in violation of MSCPA 15 U.S.C.A. § 1692, and is now attempting to carry out that illegal conduct. Defendant's also misrepresented the character, amount

LEHMAN & VALENTINO, P.C.
Attorneys at Law
43494 Woodward Avenue, Suite 215 • Bloomfield Hills, Michigan 48302.
Telephone (248) 334-7757 • Fax (248) 334-7202

and/or extent of the debt, in violation of MDCPA 15 U.S.C.A. § 1692. Defendant's violation of the MDCPA entitles Plaintiff to injunctive relief and actual damages and attorney fees under MDCPA 15 U.S.C.A. § 1692.

WHEREFORE, Plaintiff prays for judgment against the Defendants, Ocwen, HSBC, and Ace, declaratory judgment that the Defendant's that have no interest in Plaintiff's property are permanently enjoined from any proceeding to foreclose on Plaintiff's property, an order quieting title and extinguishing Sebring's mortgage recorded against the property, an award of money damages for damage to Plaintiff's good name and credit standing, from any in an amount in excess of twenty five thousand dollars ($25,000.00) as is deemed just and equitable under the facts and circumstances, including exemplary damages, actual attorney fees, and court costs interest at the statutory rate from the date of filing the Complaint and any such further relief deemed just and equitable under the facts and circumstances.

## COUNT X
## DECEPTIVE TRADE PRACTICES ACT

68.  That Plaintiff incorporates paragraphs one (1) through sixty-seven (67) of its Complaint as fully set forth herein paragraph by paragraph and word for word.

69.  That Plaintiff is a consumer under the provisions of the

Michigan Deceptive Trade Practices Consumer Protection
Act.

70. That Defendant's conduct violates the MDCPA. Ocwen's
violations of the Michigan Collection Practices Act also
amount to a violation of the MCPA. These violations have
caused Plaintiff economic and mental anguish damages for
which she seeks recovery. Ocwen's conduct was committed
knowingly and therefore, supports the imposition of
additional statutory damages under the Michigan MCPA.

WHEREFORE, Plaintiff prays for judgment against the Defendants,
Ocwen, HSBC, and Ace, declaratory judgment that the Defendant's that
have no interest in Plaintiff's property are permanently enjoined
from any proceeding to foreclose on Plaintiff's property, an order
quieting title and extinguishing Sebring's mortgage recorded against
the property, an award of money damages for damage to Plaintiff's
good name and credit standing, from any in an amount in excess of
twenty five thousand dollars ($25,000.00) as is deemed just and
equitable under the facts and circumstances, including exemplary
damages, actual attorney fees, and court costs interest at the
statutory rate from the date of filing the Complaint and any such
further relief deemed just and equitable under the facts and
circumstances.

## Count XI
## BREACH OF FIDUCIARY DUTY

71. That Plaintiff incorporates paragraphs one (1) through seventy (70) of its Complaint as fully set forth herein paragraph by paragraph and word for word.

72. That the Defendant's, as a servicing agent, stands in a fiduciary capacity with respect to Plaintiff's monthly payments and credits on her mortgage, escrow account, loan, insurance premiums and other related obligations. Defendant's has breached this duty for the numerous reasons stated above. Defendant's conduct has causes Plaintiff's losses for which she seeks to recover damages.

WHEREFORE, Plaintiff prays for judgment against the Defendants, Ocwen, HSBC, and Ace, declaratory judgment that the Defendant's that have no interest in Plaintiff's property are permanently enjoined from any proceeding to foreclose on Plaintiff's property, an order quieting title and extinguishing Sebring's mortgage recorded against the property, an award of money damages for damage to Plaintiff's good name and credit standing, from any in an amount in excess of twenty five thousand dollars ($25,000.00) as is deemed just and equitable under the facts and circumstances, including exemplary damages, actual attorney fees, and court costs interest at the statutory rate from the date of filing the Complaint and any such further relief deemed just and equitable under the facts and

Page 26 of 29

LEHMAN & VALENTINO, P.C.
Attorneys at Law
43494 Woodward Avenue, Suite 203 * Bloomfield Hills, Michigan 48302
Telephone (248) 334-7707 * Fax (248) 334-7202

circumstances.

## COUNT XII
## FRAUD

73. That Plaintiff incorporates paragraphs one (1) through seventy-two (72) of its Complaint as fully set forth herein paragraph by paragraph and word for word.

74. That Defendant's by asserting they have an interest in the Sebring mortgage and mortgage note and refusing to provide documentation and proof of same although demand has been made by Plaintiff constitutes fraud.

75. That the Defendant's by encumbering Plaintiff's property in violation of MCL 600.2901 (a) is liable to Plaintiff for all costs including actual attorney fees and all damages including exemplary damages.

WHEREFORE, Plaintiff prays for judgment against the Defendants, Ocwen, HSBC, and Ace, declaratory judgment that the Defendant's that have no interest in Plaintiff's property are permanently enjoined from any proceeding to foreclose on Plaintiff's property, an order quieting title and extinguishing Sebring's mortgage recorded against the property, an award of money damages for damage to Plaintiff's good name and credit standing, from any in an amount in excess of twenty five thousand dollars ($25,000.00) as is deemed just and equitable under the facts and circumstances, including exemplary

LEHMAN & VALENTINO, P.C.
Attorneys at Law
43494 Woodward Avenue, Suite 205 • Bloomfield Hills, Michigan 48302.
Telephone (248) 334-7787 • Fax (248) 334-7701

damages, actual attorney fees, and court costs interest at the statutory rate from the date of filing the Complaint and any such further relief deemed just and equitable under the facts and circumstances.

## COUNT XIII
## ATTORNEY FEES

76.   That Plaintiff incorporates paragraphs one (1) through seventy-six (76) as fully set forth herein paragraph by paragraph and word for word.

77.   Plaintiff has been required to employ counsel to represent her interests as a direct result of Defendant's wrongful conduct. Plaintiff employed the undersigned attorneys and Plaintiff is obligated to pay, and seek the recovery of, the attorney's reasonable fees for the services rendered on her behalf. Plaintiff has made demand on Defendant's to cease this conduct, but to no avail.

WHEREFORE, Plaintiff prays for judgment against the Defendants, Ocwen, HSBC, and Ace, declaratory judgment that the Defendant's that have no interest in Plaintiff's property are permanently enjoined from any proceeding to foreclose on Plaintiff's property, an order quieting title and extinguishing Sebring's mortgage recorded against the property, an award of money damages for damage to Plaintiff's good name and credit standing, from any in an amount in excess of

twenty five thousand dollars ($25,000.00) as is deemed just and equitable under the facts and circumstances, including exemplary damages, actual attorney fees, and court costs interest at the statutory rate from the date of filing the Complaint and any such further relief deemed just and equitable under the facts and circumstances.

Respectfully submitted,

Dated: June 25, 2007

Paul G. Valentino (P34239)
Attorney for Plaintiff
43494 Woodward Ave., Ste. 203
Bloomfield Hills, MI 48302
(248) 334-7787

# EXHIBIT A

# MORTGAGE

Loan Number 515284
MERS Number 100265600005152843

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated **SEPTEMBER 26, 2006**, together with all Riders to this document.

(B) "Borrower" is **WENDY ADELSON, A SINGLE PERSON**. Borrower's address is **3630 WALDON, LAKE ORION, MICHIGAN 48360**. Borrower is the mortgagor under this Security Instrument.

(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(D) "Lender" is **SEBRING CAPITAL PARTNERS, LIMITED PARTNERSHIP**. Lender is a **PARTNERSHIP** organized and existing under the laws of **THE STATE OF DELAWARE**. Lender's address is **4000 INTERNATIONAL PKWY, #3000, CARROLLTON, TEXAS 75007**.

(E) "Note" means the promissory note signed by Borrower and dated **SEPTEMBER 26, 2006**. The Note states that Borrower owes Lender **ONE HUNDRED SEVENTY-EIGHT THOUSAND FIVE HUNDRED AND 00/100ths** Dollars (U.S.**$178,500.00**) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **OCTOBER 1, 2036**.

(F) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

G + 5 1 5 2 8 4 + 1 0 0 2 + 0 0 1 + 0 1 3 + D E E D

**(H) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

☒ Adjustable Rate Rider  ☐ Condominium Rider  ☐ Second Home Rider

☐ Balloon Rider  ☐ Planned Unit Development Rider

☐ 1-4 Family Rider  ☐ Biweekly Payment Rider  ☒ Floor Rate Rider

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(K) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(L) "Escrow Items"** means those items that are described in Section 3.

**(M) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(N) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(O) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(P) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, warrant, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, with power of sale, the following described property located in the

_____County_____ of __OAKLAND__ :
[Type of Recording Jurisdiction]     [Name of Recording Jurisdiction]

LOT 13, FAY MORSE'S BALDWIN-WALDON ACRES SUBDIVISION, AS RECORDED IN LIBER 63, PAGE 7 OF PLATS, OAKLAND COUNTY RECORDS

G + 5 1 5 2 8 4 + 1 0 0 2 + 0 0 2 + 0 1 3 + D E E D

which currently has the address of __3630 WALDON_____
[Street]

__LAKE ORION_____, Michigan ____48360_____ ("Property Address"):
[City]                                    [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds.

MICHIGAN--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3023  1/01  *(page 3 of 13 pages)*

G + 5 1 5 2 8 4 + 1 0 0 2 + 0 0 3 + 0 1 3 + D E E D

Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow

G + 5 1 5 2 8 4 + 1 0 0 2 + 0 0 4 + 0 1 3 + D E E D

account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

MICHIGAN--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3023 1/01 *(page 5 of 13 pages)*

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.



Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

G + 5 1 5 2 8 4 + 1 0 0 2 + 0 0 8 + 0 1 3 + D E E D

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be

G + 5 1 5 2 8 4 + 1 0 0 2 + 0 0 9 + 0 1 3 + D E E D

refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

MICHIGAN--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT     Form 3023 1/01  *(page 10 of 13 pages)*



**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.



G + 5 1 5 2 8 4 + 1 0 0 2 + 0 1 1 + 0 1 3 + D E E D

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.



If Lender invokes the power of sale, Lender shall give notice of sale to Borrower in the manner provided in Section 15. Lender shall publish and post the notice of sale, and the Property shall be sold in the manner prescribed by Applicable Law. Lender or its designee may purchase the Property at any sale. The proceeds of the sale shall be applied in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall prepare and file a discharge of this Security Instrument. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.



BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____          _____ (Seal)
Please Print Name                          **WENDY ADELSON**                    -Borrower

_____          _____ (Seal)
Please Print Name                                                             -Borrower

_____ (Seal)    _____ (Seal)
                        -Borrower                                             -Borrower

State of MICHIGAN,
County of Oakland

The foregoing instrument was acknowledged before me this Sept. 27 , 2006
by, **WENDY ADELSON , A SINGLE PERSON.**

_____
(Signature of person taking acknowledgment)

_____
(Typed or printed name)

**Drafter's Certification**

This Mortgage was drafted by Amy Beatie or on behalf of Sebring Capital Partners, Limited Partnership, 4000 International Pk
whose address is 4000 International Pkwy #300
Carrollton, TX 75007

After Recording Return To:        Sebring Capital Partners, Limited Partnership
                                  4000 International Pkwy, #3000
                                  Carrollton, Texas 75007

**MICHIGAN**--Single Family--**Fannie Mac/Freddie Mac UNIFORM INSTRUMENT**    Form 3023 1/01  *(page 13 of 13 pages)*

G + 5 1 5 2 8 4 + 1 0 0 2 + 0 1 3 + 0 1 3 + D E E D

**EXHIBIT A**

Legal Description:

Land located in the Village of Lake Orion, County of Oakland, State of Michigan, and is described as follows:

Lot 13, FAY MORSE'S BALDWIN-WALDON ACRES SUBDIVISION, as recorded in Liber 63, Page 7 of Plats, Oakland County Records.

Commonly known as: 3630 Waldon
Parcel ID: 09-19-400-14

**Sebring Capital Partners, Limited Partnership**

4000 International Pkwy, #3000, Carrollton, Texas 75007

## MORTGAGE SERVICING TRANSFER DISCLOSURE

Thank you for applying for a residential Mortgage/Deed of Trust/Security Deed loan from Sebring Capital Partners, Limited Partnership

Federal Law requires that the Lender provide you with the following information.

Notice to Mortgage/Deed of Trust/Security Deed loan applicants: The right to collect your Mortgage/Deed of Trust/Security Deed loan payments may be transferred. Federal law gives you certain related rights. Read this statement and sign it only if you understand its contents.

Because you are applying for a Mortgage/Deed of Trust/Security Deed loan covered by the Real Estate Settlement Procedures Act (RESPA) (12 USC 2601 et seq.) you have certain rights under that federal law. This statement tells you about those rights. It also tells you what the chances are that the servicing for this loan may be transferred to a different loan servicer. "Servicing" refers to collecting your principal, interest and escrow account payments, if any. If your loan servicer changes, there are certain procedures that must be followed. This statement generally explains those procedures.

Transfer Practices and Requirements

If the servicing of your loan is assigned, sold, or transferred to a new servicer, you must be given written notice of that transfer. The present loan servicer must send you notice in writing of the assignment, sale or transfer of the servicing not less than 15 days before the effective date of the transfer. The new loan servicer must also send you notice within 15 days after the effective date of the transfer. The present servicer and the new servicer may combine this information in one notice, so long as the notice is sent to you 15 days before the effective date of transfer. The 15-day period is not applicable if a notice of prospective transfer is provided to you at settlement. The law allows a delay in the time (not more than 30 days after a transfer) for servicers to notify you under certain limited circumstances, when your servicer is changed abruptly. This exception applies only if your servicer is fired for cause, is in bankruptcy proceedings, or is involved in a conservatorship or receivership initiated by a federal agency.

Notices must contain certain information. They must contain the effective date of the transfer of the servicing of your loan to the new servicer, the name, address, and toll-free or collect-call telephone number of the new servicer, and toll-free or collect-call telephone numbers of a person or department for both your present servicer and your new servicer to answer your questions about the transfer of servicing. During the 60-day period following the effective date of the transfer of the loan servicing, a loan payment received by your old servicer before its due date may not be treated by the new loan servicer as late, and a late fee may not be imposed on you.

Complaint Resolution

Section 6 of RESPA (12 USC 2605) gives you certain consumer rights, whether or not your loan servicing is transferred. If you send a "qualified written request" to your loan servicer concerning the servicing of your loan, your servicer must provide you with a written acknowledgment within 20 business days of receipt of your request. A "qualified written request" is a written correspondence, other than notice on payment coupon or other payment medium supplied by the servicer, which includes your name and account number, and your reasons for the request. Not later than 60 business days after receiving your request, your servicer must make any appropriate corrections to your account, or must provide you with a written clarification regarding any dispute. During this 60-business day period, your servicer may not provide information to a consumer reporting agency concerning any overdue payment related to such period or qualified written request.

A business day is any day, excluding public holidays (state or federal), Saturday and Sunday.

Damages and Costs

Section 6 of RESPA also provides for damages and costs for individuals or classes of individuals in circumstances where servicers are shown to have violated the requirements of that section.

Servicing Transfer Estimated by Lender

1. The following is the best estimate of what will happen to the servicing of your Mortgage/Deed of Trust/Security Deed loan:

We may assign, sell or transfer the servicing of your loan sometime while the loan is outstanding. We are able to service your loan and we haven't decided whether to service your loan.

2. For all the Mortgage/Deed of Trust/Security Deed loans that we make in the 12-month period after your Mortgage/Deed of Trust/Security Deed loan is funded, we estimate that the percentage of Mortgage/Deed of Trust/Security Deed loans for which we will transfer servicing is between:

| | | |
|---|---|---|
| | 0 to 25% | |
| | 26 to 50% | |
| | 51 to 75% | |
| X | 76 to 100% | |

This estimate does include assignments, sales or transfers to affiliates or subsidiaries. This is only our best estimate and it is not binding. Business conditions or other circumstances may affect our future transferring decisions.

3. This is our record of transferring the servicing of the Mortgage/Deed of Trust/Security Deed loans we have made in the past:

| Year | Percentage of loans transferred (rounded to nearest quartile-- 0%, 25%, 50%, 75% or 100%) |
|---|---|
| 2003 | 100% |
| 2004 | 100% |
| 2005 | 100% |

This information does include assignments, sales or transfers to affiliates or subsidiaries.

_____
Lender

**SEPTEMBER 26, 2006**
Date

Acknowledgment of Mortgage/Deed of Trust/Security Deed Loan Applicant. I/we understand that this acknowledgment is a required part of the Mortgage/Deed of Trust/Security Deed Loan Application.
I/we have read this disclosure form, and understand its contents, as evidenced by my/our signature(s) below.

| | 09-26-06 | | |
|---|---|---|---|
| WENDY ADELSON | Date | | Date |

_____     _____
Date                         Date

_____     _____
Date                         Date



Loan Number  515284

# NOTICE OF ASSIGNMENT, SALE OR TRANSFER OF SERVICING RIGHTS

Borrower:  **WENDY ADELSON**

Address:  3630 WALDON, LAKE ORION, MICHIGAN 48360

You are hereby notified as a requirement of Section 6 of the Real Estate Settlement Procedures Act (RESPA) (12 U.S.C. § 2605) that the servicing of your mortgage loan, that is, the right to collect payments from you, is being assigned, sold or transferred from SEBRING CAPITAL PARTNERS, LIMITED PARTNERSHIP _____ to _____, effective SEPTEMBER 26, 2006 _____.

The assignment, sale or transfer of the servicing of the mortgage loan does not affect any term or condition of the mortgage instruments, other than terms directly related to the servicing of your loan.

Except in limited circumstances, the law requires that your present servicer send you this notice at least 15 days before this effective date or at closing. Your new servicer must also send you this notice no later than 15 days after the effective date of transfer or at closing. In this case, the present servicer and the new servicer have combined all necessary information in this one notice.

Your present servicer is SEBRING CAPITAL PARTNERS, LIMITED PARTNERSHIP _____. If you have any questions relating to the transfer of servicing from your present servicer call (800) 716-6220 _____ between 8:00 a.m. and 5:00 p.m. on the following days _____ Monday thru Friday _____. This is a toll-free [or collect call] number.

Your new servicer will be _____. The business address for your new servicer is: _____. The toll-free [or collect call] telephone number of your new servicer is _____. If you have any questions relating to the transfer of servicing to your new servicer, call CUSTOMER SERVICE at [toll free or collect call telephone number] between 9:00 a.m. and 5:00 p.m. on the following days MONDAY - FRIDAY .

The date that your present servicer will stop accepting payments from you is    NOVEMBER 1, 2006 .
The date that your new servicer will start accepting payments from you is _____ NOVEMBER 1, 2006 .
Send all payments due on or after that date to your new servicer.

The transfer of servicing rights may affect the terms of or the continued availability of mortgage life or disability insurance or any other type of optional insurance in the following manner:    N/A _____

and you should take the following action to maintain coverage: _____
   N/A

You should also be aware of the following information, which is set out in more detail in Section 6 of RESPA (12 U.S.C. § 2605):

During the 60-day period following the effective date of the transfer of the loan servicing, a loan payment received by your old servicer before its due date may not be treated by the new loan servicer as late, and a late fee may not be imposed on you.

Section 6 of RESPA (12 U.S.C. § 2605) gives you certain consumer rights. If you send a "qualified written request" to your loan servicer concerning the servicing of your loan, your servicer must provide you with a written acknowledgment within 20 business days of receipt of your request. A "qualified written request" is a written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, which includes your name and account number, and your reasons for the request. Not later than 60 business days after receiving your request, your servicer must make any appropriate corrections to your account, and must provide you with a written clarification regarding any dispute. During this 60 business day period, your servicer may not provide information to a consumer reporting agency concerning any overdue payment related to such period or qualified written request. However, this does not prevent the servicer from initiating foreclosure if proper grounds exist under the mortgage documents.

A business day is day on which the offices of the business entity are open to the public for carrying on substantially all of its business functions.

Section 6 of RESPA also provides for damages and costs for individuals or classes of individuals in circumstances where servicers are shown to have violated the requirements of that Section. You should seek legal advice if you believe your rights have been violated.



Date:    SEPTEMBER 26, 2006 _____

_____
**WENDY ADELSON**

_____

# EXHIBIT B

**OCWEN Loan Servicing, LLC**
**P.O. Box 785055**
**Orlando, FL 32878-5055**

12/19/2006

Wendy Adelson
3630 Waldon
Lake Orion, MI 48360

## NOTICE OF ASSIGNMENT, SALE OR TRANSFER OF SERVICING RIGHTS

OCWEN LOAN #:    80331044
PROPERTY ADDRESS:   3630 Waldon
                           Lake Orion, MI 48360

Dear Mortgagor(s):

Ocwen Loan Servicing, LLC ("Ocwen") would like to welcome you as a new customer. In accordance with Section 6 of the Real Estate Settlement Procedures Act ("RESPA") (12 U.S.C. Section 2605), we are informing you that effective 12/15/2006, the servicing of your mortgage loan, that is the right to collect payments from you, will be assigned, sold and/or transferred from Sebring Capitol Corporation to Ocwen. Except in limited circumstances, the law requires that your new Servicer must send you notice no later than 15 days after this effective date. The assignment, sale, or transfer of the servicing of the mortgage loan does not affect any term or condition of the mortgage instruments, other than terms directly related to the servicing of your loan.

Your present Servicer is Sebring Capitol Corporation. If you have questions relating to the transfer of servicing from your present Servicer, please call Sebring Capitol Corporation Customer Service Department, Monday through Friday, between 9.00AM a.m. and 9.00PM p.m. EST at 1-800-716-6220. This is a toll-free telephone number.

Your new Servicer will be Ocwen. The business address for your new Servicer is set forth in the paragraph below. The toll-free telephone number for your new Servicer is 1-800-746-2936. If you have any questions, please contact Ocwen's Customer Relations Department, Monday through Thursday, between 9:00 a.m. and 9:00 p.m. EST, or Fridays between 9:00 a.m. and 8:30 p.m. EST. Information concerning Ocwen and your mortgage loan may also be found online at www.ocwen.com.

Effective 12/15/2006 please direct your monthly mortgage payments to your new Servicer, Ocwen. Sebring Capitol Corporation will stop accepting payments from you on 12/14/2006. Please send all payments due on or after that date to Ocwen at the payment address indicated below:

**PAYMENTS**
Ocwen
P.O. Box 6440
Carol Stream, IL 60197-6440

**CORRESPONDENCE**
Ocwen
Attn: Research Dept.
P.O. Box 785055
Orlando, FL 32878-5055

Please note that payments sent to any other location will cause a delay in posting. Payments and correspondence sent to Ocwen should include your new Ocwen Loan Number, as shown above. For your convenience, we have included a temporary payment coupon on the other side of this letter.

Additionally, it is important to contact your insurance agency to ensure that (i) Ocwen receives proof of hazard insurance (with flood and/or windstorm coverage, as applicable) on your property and (ii) Ocwen is named as the beneficiary in the Mortgagee Clause of your policy. If your mortgage payment includes escrow for taxes or insurance, please take the necessary steps to have all future bills forwarded to:

**INSURANCE**
Ocwen
ISAOA
P. O. Box 6723
Springfield, OH 45501-6723

**PROPERTY TAXES**
Ocwen
Attn: Tax Department
PO Box 961260
Ft. Worth, TX 76161-0260
Phone: 1-888-656-3672

You may also forward evidence of insurance or insurance bills via fax or e-mail to Ocwen:

Toll Free Fax: 1-888-882-1816

E-mail: updateinsuranceinfo@ocwen.com

# EXHIBIT C



# Dallas Business Journal

Members: Log in
Not Registered? Register for free extra services.



HOME˅  |  ONLINE EDITION˅  |  PRINT EDITION˅  |  SUBSCRIBE˅  |  MARKETPLACE˅  |  BUSINESS RESOURCE

Search  Keywords      GO   Search Archive                                    ⊞ News by C

**LATEST NEWS**

Dallas > News > Industries > Economic View - Bankruptcies

BUSINESS PULSE SURVEY:  What impact will the new minimum wage increase have on your business?

# Sebring Capital ceases operations

Dallas Business Journal - December 4, 2006 by Jaime S. Jordan Web Editor

🖨 Print this Article  ✉ Email this Article  🗐 Reprints  📡 RSS Feeds  ★ Most Viewed  ★ Most Emailed

**Sebring Capital Partners LP** shut its doors last week.

The Carrollton-based wholesale residential mortgage lender was forced to cease operations and send employees home Friday because of a combination of market conditions, said Michael Waldron, the company's senior vice president for legal and compliance.



"It was unexpected and unfortunate, and we pursued several different avenues in order to try to avoid this," Waldron said. "We're now in the process of trying to do as orderly a wind-down of operations as possible. There's so much uncertainty and sadness."

The company, which focused on subprime mortgages, was operating with a skeleton crew Monday to accommodate the transition.



WHAT CAN BROWN DO FOR YOU?

Rollover to see.

Waldron said Sebring will honor the loans it has that are approved and in process, as long as conditions are met and the company can close on the loans by Dec. 15.

About 325 employees worked for the company, which was started in May 1996. Data from industry publication Origination News estimates that Sebring closed $209 million in mortgage loans in the second quarter of 2006, down from $235 million in second-quarter 2005. The same data source shows that the company had originated $449 million in mortgage loans in the second quarter of 2003.

BUSINE
**Starting**
Sponsore
His firm
recent l

**Sales &**
Sponsore
**Workin**
partners
merger

**Buildin**
Sponsore
**New gr**
mature

**Techno**
**Benefit**
improve
injury

**HR & C**
**Getting**
everyon
busines

**DALLA**
powered
**Featur**

Max Re
Min Rer
Building
Use Typ
→  More

Waldron said the employees will receive pay for work done through Nov. 30, as well as for work on Friday. He added that the company was working with a number of consumer financial services players to try to find positions for the employees.

Web site: **www.sebringcapital.com**

*jsjordan@bizjournals.com | 214-706-7106*

[ Contact the Editor ] [ Need Assistance? ] [ More Latest News → ]

**Subscribe or renew online**

**RELATED INDUSTRY STORIES**

- One analyst lifts Fifth Third view, but others aren't convinced [Cincinnati]
- AMEX drops PYR Energy after purchase [Denver]
- SunTrust's Hutchinson to retire at year's end [Baltimore]
- Analyst: FedEx's Q4 results likely 'below expectations' [Memphis]
- Bank 1440 opening in Peoria after raising $25M in capital [Phoenix]

**TODAY'S LATEST NEWS STORIES**

- Furmanite names COO
- Women's center breaks ground a new facility
- Presbyterian Hospital of Plano names COO
- Karahan Cos. sells a stake in Shops at Legacy
- Report: TPG among bidders for Cadbury
- → Most Viewed Stories
- → Most Emailed Stories
- → People in the News

**DALLAS JOBS**                    powered by onTargetjobs

- Information Technology Opportunities - American Career Fairs
- Industry leader seeks entrepreneurs - Ameriprise Financial
- Maternal Child Director - Community Health Systems
- Accounting Opportunties - American Career Fairs
- Financial Advisor - U.S. cities - UBS Financial Services

**Search Jobs | Post Resume | View More**

**Employers - Post a Job Today**

**Build your own wealth-management practice.**                    ❖ UBS
Your exceptional talent drives our success. UBS Wealth Management. It starts with you. You and us.
Click here to learn about the UBS New Financial Advisor Development program.

**SEARCH PRESS RELEASES**

- View all Dallas Press Releases
- View ALL Press Releases

Search by Company, Organization, or Keyword
[GO]

Content provided by PR Newswire. Learn more about this service

» **Sign up for breaking news alerts.**    Brought to you by Cingular



# denverpost.com

Home    News    Politics    Sports    Business    Entertainment    Lifestyle    Opinion    Outdoors    Travel

Books | Fine Arts | Bars | Dining | Calendar | Columnists | ColoradoSunday | Comics | Games | Movies | Movie Times | Mus

Subscribe / Customer Care    PDF    Electronic Edition    RSS    Web Feeds    Email Newsletters    Se

business

## Mortgage bank abruptly closes

🖶 Print    ✉ Email

**Sebring Capital Partners, a Texas-based subprime lender with a Denver-area office, falls prey to the rising rate of defaults in another sign of the industry's trouble.**
By Greg Griffin
Denver Post Staff Writer
Article Last Updated: 12/05/2006 09:47:35 PM MST

A Texas mortgage bank that employed 50 people in the Denver area abruptly closed its doors Friday, signaling more trouble in the subprime lending industry.

Sebring Capital Partners notified employees of their termination Friday. The company posted a message on its website announcing the closing without giving an explanation.

Carrollton, Texas-based Sebring employed 325 people, including 50 in the Inverness area of Arapahoe County.

A company executive confirmed the closing Tuesday.

"We're in the process of orderly winding down," said Michael Waldron, senior vice president of legal and compliance. "We're trying to get people placed. We continue to explore all available options."

Subprime lenders - who cater to borrowers with poor credit - are struggling with rising default rates.

Eight percent of subprime borrowers are at least 60 days late on their mortgage payments, according to a UBS analysis of loans packaged and sold as securities. That's up from 4.5 percent a year ago.

Loans in default often end up in foreclosure, where homeowners may lose their houses. Colorado has had the nation's highest foreclosure rate for eight months, according to California industry researcher Real tyTrac.

Banks are responding to rising defaults by closing or trying to sell their subprime operations.

Atlanta-based NetBank last month closed its subprime lending unit and transferred most of its employees to another company. H&R Block is seeking a buyer for its Option One Mortgage Corp., a subprime lender. Key Corp. is selling its subprime Champion Mortgage business.

Sebring's Waldron acknowledged that subprime lenders are struggling, but he said it would be wrong to attribute Sebring's closing to that alone.

A former employee who requested anonymity told The Denver Post that Sebring, like other subprime lenders, was hurt by rising defaults.

A major investor stopped funding Sebring's loans as a result, forcing the company to seek a buyer, the former employee said. Sebring had to close after a potential acquisition fell through.

Waldron would not comment on the specifics.

"We were exploring several different opportunities, and unfortunately none of them came to fruition in a manner that allowed us to continue as a going concern," he said.

Sebring made loans of $209 million during the second quarter of 2006, down 11 percent from last year, according to Origination News magazine.

Sebring was a wholesale mortgage lender, meaning it sold loans to brokers rather than directly to consumers. It was founded in 1996 and opened its Arapahoe County office in June.

The company said on its website that loans that have been approved must close by Dec. 15.

*The Associated Press contributed to this report.*

*Staff writer Greg Griffin can be reached at 303-954-1241 or ggriffin@denverpost.com.*

Print  Email  Return to Top  Subscribe

**ARTICLE COMMENTS**                                    Login | Sign Up

**Add A Comment**    If you're not registered with our site, you will be asked to do so. It's quick (it takes about 30 seconds) and we only require your email and first name. You are responsible for the content you post. Comments that include profanity, personal attacks or any other inappropriate material are prohibited. By using our site you agree to our ground rules and our terms of use.

**Denver & the West**    Blogs | Obituaries   RSS

Crews battle West Slope blazes
Farmers sowing seed money
Empty chairs at DPS

**Sports**    Broncos | Nuggets | Preps | More   RSS

Back in the money
Paige: A-Rod fantasy lives on
Vail cyclist conquering the odds

**Business**    Al Lewis | Tech | More   RSS

Colorado visitors snowball
Yankees draw crowds to LoDo
Hospitals trimming staffs

**Entertainment**    Husted | Movies | Music | TV   RSS

Ballroom-dance show cut short by Sept. 11 gets Denver encore
New on DVD
"Cat Returns" is gentle anime

**Opinion**    Columns | Letters | More   RSS

Don't leave it to the beavers
Return fairness to drug laws
Gun reform with NRA blessing

**Watercooler**    Arcade | Crossword | Sudoku   RSS

Reptiles smuggled in garden gnomes
Reptiles smuggled in garden gnomes
Petite woman downs 26 franks in 12 min.

# EXHIBIT D

FORECLOSURE NOTICE This firm is a debt collector attempting to collect a debt. Any information obtained will be used for this purpose. If you are in the Military, please contact our office at the number listed below. MORTGAGE SALE- Default has been made in the conditions of a certain mortgage made by: Wendy Adelson, a Single Person to Mortgage Electronic Registration Systems, Inc., solely as nominee for Sebring Capital Partners, Limited Partnership, Mortgagee, dated September 26, 2006 and recorded November 3, 2006 in Liber 38341 Page 483 Oakland County Records, Michigan. Said mortgage was subsequently assigned to: HSBC Bank USA N.A., as Trustee on behalf of ACE Securities Corp. Home Equity Loan Trust and for the registered holders of ACE Securities Corp. Home Equity Loan Trust 2007-HE1 Asset Backed Pass-Through Certificates, on which mortgage there is claimed to be due at the date hereof the sum of One Hundred Eighty-Six Thousand Six Hundred Seven Dollars and Sixty-Eight Cents ($186,607.68) including interest 9.99% per annum. Under the power of sale contained in said mortgage and the statute in such case made and provided, notice is hereby given that said mortgage will be foreclosed by a sale of the mortgaged premises, or some part of them, at public vendue, on the 1st floor Main entrance to the Court House in Pontiac at 10:00AM on Tuesday, July 3, 2007. Said premises are situated in Village of Lake Orion, Oakland County, Michigan, and are described as: Lot 13, FAY MORSE'S BALDWIN-WALDON ACRES SUBDIVISION, as recorded in Liber 63, Page 7 of Plats, Oakland County Records Commonly known as 3630 Waldon, Lake Orion MI 48360 The redemption period shall be 6 months from the date of such sale, unless determined abandoned in accordance with MCL 600.3241 or MCL 600.3241a, in which case the redemption period shall be 30 days from the date of such sale, or upon the expiration of the notice required by MCL 600.3241a(c), whichever is later. Dated: JUNE 4, 2007 HSBC Bank USA N.A., as Trustee on behalf of ACE Securities Corp. Home Equity Loan Trust and for the registered holders of ACE Securities Corp. Home Equity Loan Trust 2007-HE1 Asset Backed Pass-Through Certificates, Assignee of Mortgage Attorneys Potestivo & Associates, P.C. 811 South Blvd. Suite 100 Rochester Hills, MI 48307 (248) 844-5123 Our File No: 07-71746 ASAP# 860840 06/05/2007, 06/12/2007, 06/19/2007, 06/26/2007

# EXHIBIT E